UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In re:

ANTARAMIAN PROPERTIES, LLC      Case No. 9:14-bk-10145-CED [Lead Case]
ANTARAMIAN FAMILY, LLC         Case No. 9:14-bk-10146-CED
ANTARAMIAN FAMILY TRUST,      Case No. 9:14-bk-10148-CED

       Debtors.                (Jointly Administered Cases)

_____/

### ANTARAMIAN PROPERTIES, LLC'S EMERGENCY MOTION TO OBTAIN POSTPETITION FINANCING AND GRANT SENIOR LIENS, SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, AND ADEQUATE PROTECTION

*Emergency Hearing Requested in connection with other matters in this chapter 11 case already scheduled for hearing on Thursday, September 18, 2014, at 10:00 a.m.*

---

### STATEMENT OF RELIEF REQUESTED

Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtor provides this statement of the relief requested in this Motion. Through the Motion, the Debtor seeks authority to borrow money, pursuant to a loan facility, in order to preserve the value of estate assets by funding payments to certain vendors and unit owners, the retention of certain professionals by the Debtor, and to provide for the protection of creditors' interests, in accordance with the proposed budget, which is attached as **Exhibit "A"** to this Motion. **The liens proposed to be granted would be senior liens on all property of the Debtor.** This Motion seeks to have the liens granted pursuant to any financing approved by this Court to be deemed perfected without the need for further filings. The principal terms of the loan facility are as set forth in the identified pages of the Commitment Letter, and as further summarized in paragraph 16 of this Motion: (a) borrowing limit of $6,250,000.00 (Amount of Loan/Advances, p. 2), with an immediate request to borrow $995,000.00 of such amount on an emergency basis, (b) twelve (12) month maturity, with an optional 12 month extension (Term, p. 3), (c) interest rate of 13% (Interest/Interest Reserve, p. 4), (d) secured by a priming first priority senior lien subject only to certain *ad valorem* taxes (Collateral/Other Rights, p. 5), (e) events of default, including failure to pay (Default/Remedies, p. 10), and (f) various borrowing conditions, including the entry of a final order approving the financing (Conditions, p. 11). Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor seeks funding on an emergency basis and a hearing in less than fourteen (14) day to the extent necessary to avoid immediate and irreparable harm to the estate, and pursuant to Bankruptcy Rule 6004(h), the Debtor requests that the Court's order granting the Motion be effective immediately upon entry and the fourteen day stay imposed by Bankruptcy Rule 6004(h) be waived.

Antaramian Properties, LLC ("Properties" or the "Debtor"), as debtor and debtor-in-possession, pursuant to Sections 105 and 364(c) and (d) of the Bankruptcy Code[1] and Bankruptcy Rule 4001(c),[2] files this motion (the "Motion") and respectfully requests that this Court (1) authorize Properties to borrow on a secured basis from EFO Financial Group, LLC (the "Lender" or "EFO") the principal amount of up to $6,250,000.00 (the "DIP Facility"), substantially in accordance with the terms of this Motion and the credit agreement in the form of the Commitment Letter attached as **Exhibit "B,"** (2) authorize Properties to borrow on an immediate emergency basis up to $995,000.00 to fund potential operating shortfalls, unit owner payments, and payments needed for the retention of certain professionals needed to maintain and protect assets of the estate, (3) authorize the Debtor to enter into and execute a loan agreement, promissory note, deed of trust or mortgage, and security agreement in favor of the Lender, which shall be consistent with the provisions of this motion and the Commitment Letter (collectively, the "DIP Loan Documents"), as such other documents, instruments, and agreements and perform all such other acts as may be required in connection with the DIP Loan Documents, (4) authorize the Debtor to obtain postpetition financing and incur postpetition indebtedness under the DIP Facility, which financing and indebtedness due and owing by the Debtor to the Lender shall be secured by liens and security interests in all property of the Debtor that are senior to all prepetition and postpetition liens or other interests encumbering property of the Debtor, with the exception of certain ad valorem

---

[1] All references to the "Bankruptcy Code" are to the applicable section of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

[2] All references to the "Bankruptcy Rules" shall refer to the Federal Rules of Bankruptcy Procedure.

taxes ("DIP Liens"), (5) grant the Lender a superpriority administrative expense claim having priority over any and all administrative expenses and priority claims against the Debtor and its estate, subject only to a Carve-Out described below for payments of the Debtor's bankruptcy counsel and amounts owed to the United States Trustee, (6) modify and, to the extent necessary, lift the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender and the Debtor to implement the terms of this Motion, and (7) grant the Debtor such other and further relief as the Court deems necessary, appropriate, equitable, proper, and consistent with the terms of this Motion.  In support of this Motion, the Debtor states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL POSTURE

2.      On August 29, 2014 (the "Petition Date"), Properties, along with Antaramian Family, LLC and Antaramian Family Trust (collectively, the "Debtors") filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases, and no official committees have been appointed pursuant to Section 1102 of the Bankruptcy Code.

5.     The Debtors' cases are consolidated for procedural purposes and are jointly administered pursuant to this Court's *Orders Granting Debtors' Motions for Joint Administration of Affiliated Cases* entered in each of the chapter 11 cases on September 3, 2014.

## FACTUAL BACKGROUND

6.     Properties is a Florida limited liability company which is the owner and developer of portions of a large condominium, marina, and hotel project known as the Naples Bay Resort (the "Resort").  A detailed factual background regarding the Resort can be found in the *Debtors' Joint Case Management Summary* (Doc. No. 13), which is incorporated into this Motion by this reference.

7.     Since February 28, 2006, Properties has retained and used BMC-Benchmark Management Company.  ("Benchmark") as its property manager for the Resort.  Since that time, Benchmark has essentially managed the day-to-day operations of the Resort and has received virtually all revenues and paid the operating expenses of the Resort from the rents and other income.  Importantly, virtually all of the personnel that work at the Resort are employees of Benchmark.

8.     Three creditors have asserted the following secured claims against the Debtor's property:

    (a)     Properties' primary secured lender is Naples Bay Financial Holdings, LLC ("NB Financial"), which asserts a first mortgage and all asset

Case 9:14-bk-10145-FMD    Doc 48    Filed 09/16/14    Page 5 of 23



lien against the Resort and Properties' assets, including cash and receivables. NB Financial declared the loan in default on August 22, 2014. NB Financial asserts that Properties owes approximately $16,500,000.00 to NB Financial on account of this obligation.

(b)     Properties' former legal counsel, Hahn Loeser & Parks, LLP ("Hahn Loeser"), asserts a secured claim by virtue of a default judgment it obtained against Properties and Family in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida, on June 17, 2014, in the amount of $4,624,490.73 (the "Hahn Loeser Judgment"). The Debtors believe the Hahn Loeser Judgment was obtained prematurely, and have moved for rehearing and to set aside the default judgment. One day later, on June 18, 2014, Hahn Loeser recorded its default judgment in the public records of Collier County and filed a judgment lien certificate in Florida's Judgment Lien Registry, notwithstanding the prospect of rehearing of the default judgment and prior to the expiration of the time to seek rehearing.

(c)     F. Fred Pezeshkan, Raymond Sehayek, and Iraj Zand (collectively, "PZS") assert a secured claim by virtue of this Court's August 11 2014 amended final judgment in the amount of $2,813,568.51 (the "PZS Judgment") in favor of and against the Debtors and Jack Antaramian, individually, for certain attorney's fees and costs in connection with Adversary Proceeding No. 9:12-ap-00683-FMD (the "PZS Adversary"). The PZS Judgment was recorded in public records of Collier County on August 15, 2014, and PZS recorded a judgment lien certificate in Florida's judgment lien registry on August 26, 2014.[3]

9.      The Debtor believes the value of the components of the Resort owned by Properties exceeds $38,000,000.00.

10.     As is common in Florida's hospitality industry, revenue for the months of August and September are typically at a low. Exacerbating the historically low revenue during this part of the season, the costs surrounding the acrimonious litigation among the

---

[3] For the purposes of this Motion, NB Financial, PZS, and Hahn Loeser shall be collectively referred to as "Secured Creditors." The use of the term "Secured Creditors" is solely for convenience purposes and should not be construed as an admission of any kind of the Debtors or in any way deemed to waive any bases for objecting to the claims of NB Financial, PZS, and Hahn Loeser.

Debtors, PZS, and Hahn Loeser, together with the resulting operational paralysis, necessitate the DIP Facility, as the Debtor is potentially facing imminent operational cash shortfalls.

## PROPOSED USE OF FUNDS

11.     The budget attached as Exhibit "A" to this Motion sets forth the amounts Properties seeks to borrow pursuant to the DIP Facility and the proposed uses for those funds.  It is presently anticipated that the funding of the loan under the DIP Facility will occur in three tranches:

> (i) an initial emergency advance of $995,000 (the "<u>Emergency Advance</u>"), resulting in net proceeds of $800,000 that will be available to the Debtor to pay (a) operating and maintenance expenses in the ordinary course of business, (b) payments due to unit owners to the extent permitted by the Bankruptcy Code or specific order of this Court,[4] (c) retainers to professionals who, upon approval by separate order, will represent the Debtor, preserving causes of actions and appeals for the benefit of the estate, (d) complete the construction and furnishing of one townhome unit at the Resort, and (e) the fees and costs set forth in the Commitment Letter;

> (ii) an interim advance of $1,505,000 (the "<u>Interim Advance</u>"), resulting in net proceeds of $1,216,000 to be used for operational expenses, including payroll to Benchmark employees and compensation for management and administrative services provided by Robert Frazitta, Renae Fliflet, and Frank Delgado, and the fees and costs set forth in the Commitment Letter[5]; and

---

[4] The immediate need, including the payments due to unit owners, are the subject of the *Debtors' Preliminary Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral and Providing Adequate Protection* (Doc. No. 14) (the "<u>Cash Collateral Motion</u>") and the supplement to the Cash Collateral Motion (Doc. No. 34).

[5] By separate motion, the Debtor intends to seek approval of compensation to be paid to Robert Frazitta, Renae Fliflet, and Frank Delgado for their management and administrative services provided to the Debtor. These individuals are employed by Antaramian Development Corp of Naples ("<u>Development</u>").  Mr. Antaramian is the 100% shareholder of Development.  Properties, has from time to time provided funding to Development for payment of these amounts.

(iii) a final advance of $3,750,000 (the "Final Advance"), resulting in net proceeds of $3,030,000 to be used as a source of additional liquidity and capitalization, collateral or security and to pay the fees and costs set forth in the Commitment Letter.

12.     The proposed DIP Facility will enable Properties to maintain continuity of operations at the Resort and the Debtor's good will and reputation among guests, customers, and the Resort community.  In addition to preserving the going concern value of the Resort, the proposed DIP Facility would provide immediate funding of post-petition retainers for the Debtor's special counsel, who must act immediately to preserve the Debtors' rights, claims, and causes of action in various pending litigation and appeals.

13.     The Debtor submits that the approval of the DIP Facility and, particularly the Emergency Advance, will alleviate the issues arising in connection with the budget shortfalls.  For example, in light of the "tight" cash flow budgets, Benchmark has expressed concern about ensuring the Debtor has sufficient cash flow and liquidity to pay Benchmark's employees, and Benchmark has implemented a hiring freeze, while remaining unwilling to fund any operating shortfalls.  Absent obtaining financing, Benchmark may take further action to protect its interests that could include reducing staff levels.  These problems would be particularly harmful to the Debtor during the upcoming months of peak operations and would likely result in reduced revenue and increased instability.  In the absence of the financing, the value of the Resort would be adversely impacted, to the detriment of all creditors of the Debtor.

14.     In addition, Properties owns nine residential condominium units, five of which require improvements before they can be rented or sold.  The four finished units

are 2,200 square foot flats, while the five unfinished units are 4,000 square foot three story townhome units, complete with an internal elevator allowing immediate access from the garage to the top level.  The Debtor estimates that it will cost approximately $200,000 to complete the build out and furnishing of each unit so that the inventory is sale or lease ready (so as to become income producing).  The Debtor believes that a sale of a "flat" would generate net proceeds of approximately $1,200,000.00, and a monthly rental of a unit would yield approximately $15,000-$18,000 per month, while a sale of a townhome could generate significantly more.  It is the Debtor's present intention to build-out and furnish at least one of the five townhome units, because it has no completed townhome units in inventory, as all of the other units which already built out and furnished are one story models.  The Debtor intends to use the townhome as a model unit that prospective owners or tenants could walk through to experience the luxurious floor plan, which will the Debtor believes will promote sales of the townhome units for the benefit of the estate.  If the construction is not commenced within the next thirty (30) to forty-five (45) days, the unit will not be completed so that is may be shown as a model during the upcoming high season.

## TERMS OF THE DIP FACILITY

15.    The Debtor has identified EFO, a Florida limited liability company, as a potential lender.  Other than having previously loaned funds to the Debtor, neither the Lender nor its participants, nor any of their respective officers, directors, managers or members is an affiliate of, or otherwise connected with the Debtors, or with any

creditor or principal of the Debtors.[6]

16.    The principal features of the DIP Facility, as set forth in the Commitment

Letter are as follows:[7]

(a)    Amount of Loan.    The loan (the "Loan") will be in the **maximum aggregate principal amount of $6,250,000.00**, which amount includes the Interest Reserve, the Commitment Fee, the Loan Servicing Fee, and the Closing Costs which, together with any other fees or costs as provided in the Commitment Letter and/or in the DIP Loan Documents, shall be hereinafter referred to collectively as the "Maximum Loan Amount."

(b)    Security and Priority. The Loan **shall be secured by a first priority senior mortgage** (or deed of trust or similar security instrument) lien on all of the real property which the Debtor owns and all other property interests, real, personal or intangible, of the Debtor, now existing or hereafter acquired, including, without limitation, contract rights and property interests acquired postpetition (hereafter collectively referred to as the "Collateral"). The Collateral shall include, but not be limited to, the Debtor's interests in the Resort. **The priming mortgage liens and security interests in favor of the Lender shall be senior to any and all other liens, mortgages and security interests encumbering said Collateral pursuant to 11 U.S.C. §§ 364(d) and 364(c)(2). The Lender's mortgage liens and security interests in the Collateral shall be senior to all other interests of any party, including, without limitation, NB Financial, Hahn Loeser, PZS, and tax liens (except *ad valorem* taxes for 2014 and subsequent years).** The DIP Lien may also be subject to such other interests, such as the declaration of condominium, if any, and related instruments, and any and all covenants, deed restrictions, equitable servitudes or other rights in such Collateral as may be acceptable to the Lender, its counsel and the Title Company.  The Lender's mortgage liens and security interests shall not be primed, surcharged, altered or impaired, marshaled or otherwise adversely affected in any way, whether requested by a creditor of the Debtor or any other party. No claim or expense shall have priority over, or be *pari pasu* with,

---

[6] The Debtor posits that EFO's willingness to lend to the Debtor again is, in and of itself, evidence of the value of the Resort.

[7] Unless otherwise defined, capitalized terms used herein shall have the meaning scribed thereto in the Commitment Letter.

the Lender's rights in the Collateral.

(c)    Superpriority Administrative Expense Claim.    As a condition precedent to the Lender's obligation to make the Loan and as a material inducement to the Lender, **the Lender shall also receive a superpriority administrative expense in the Debtor's chapter 11 or any subsequent chapter 7 case** pursuant to 11 U.S.C. §§ 364(c)(1), 503(b), and 507(b), with priority over all other administrative expense claims in the Debtor's case except (i) fees payable to Debtor's bankruptcy counsel in this chapter 11 case, not to exceed a total amount of $175,000.00, and (ii) fees payable to the Office of the United States Trustee (the "Carve-Out"), with the proviso that the Lender's first lien position with respect to the Carve-Out shall not be subject to surcharge, either pursuant to 11 U.S.C. § 506(c) or otherwise.    Except for the Carve-Out, no administrative expense, and no claim allowed and payable under 11 U.S.C. §§ 330, 331, 503(b), 506(c), 507, or 726 shall have priority over, or be *pari pasu* with, the Lender with respect to any asset of the Debtor which constitutes either the Collateral pursuant to 11 U.S.C. §§ 364(d), 506(c), or otherwise or with respect to the claims of the Lender pursuant to 11 U.S.C. § 364(c)(1).

(d)    Advances under the DIP Facility.    The Loan shall be in three (3) phases: the Emergency Advance, the Interim Advance, and the Final Advance.    The advances shall be made upon the entry of a Final Order by the Bankruptcy Court approving the advance and the satisfaction of the requirements of the Commitment and the Loan Documents.

(e)    Use of Proceeds.    The Loan proceeds shall be used by the Debtor in accordance with the Budget, which Budget may be modified as approved by the Lender on or before the date of the hearing before the Court on this Motion.

(f)    Interest Rate.    The Loan will bear interest at thirteen percent (13%) per annum (the "Contract Rate"), computed on the basis of a 30-day month and a 360-day year.    Monthly payments of interest only on the unpaid principal balance shall be due on the first day of each month for the prior month's interest until the Maturity Date of the Loan, at which time the entire balance of principal and accrued unpaid interest thereon together with any costs and expenses then owing, shall be due and payable in full.

(g)    Default Rate.    Upon occurrence of an event of default, interest shall accrue to the Lender at the lower of the sum of the Contract

Rate and an additional five percent (5%) for a total default rate of eighteen percent (18%) or the maximum effective interest rate allowable under applicable state or federal law on all amounts then outstanding from the date of default (the "<u>Default Rate</u>").  Without limiting the generality of the foregoing, payments made more than five (5) business days past their due date shall be deemed to be in default and shall be assessed at the Default Rate.  If the Default Rate's effective interest rate exceeds the maximum rate allowable by applicable state or federal law, the Debtor and the Lender will reduce the Default Rate's effective interest rate to the maximum rate allowable by applicable state or federal law.

(h)    <u>Maturity Date; Loan Extension</u>.  The maturity date of the Loan shall be the date which is twelve (12) months after the date of the Closing of the closing of the Loan (the "<u>Maturity Date</u>").  The Debtor shall have the option, provided no default exists, to extend the term of the Loan for an additional twelve (12) months after the Maturity Date (the "<u>Loan Extension</u>").  In the event of a Loan Extension, interest shall accrue, during the Loan Extension, to the Lender at the Contract Rate on the unpaid principal balance of the Loan with monthly payments of interest only on the unpaid principal balance as set forth above.  Furthermore, as a condition of the Loan Extension, the Debtor shall, on or before the original Maturity Date, pay to the Lender (a) an Extension Fee a fee calculated as two percent (2.00%) of the unpaid principal balance of the Loan outstanding as of the original Maturity Date, and (b) a Loan Servicing Fee equal to one and two-tenths percent (1.20%) of the unpaid balance of the Loan outstanding as of the original Maturity Date.

(i)    <u>Commitment Fee</u>.  At the time of the funding of the Emergency Advance, the Interim Advance, and the Final Advance, from the proceeds of each such funding, the Debtor shall pay to the Lender a commitment fee calculated as four percent (4%) of the maximum amount of each such Advance (the "<u>Commitment Fee</u>"), due and fully earned at Closing.   For the avoidance of doubt, the Emergency Advance shall not be included in the calculation of the Commitment Fee with respect to the Interim Advance, and neither the amount of the Emergency Advance nor the Interim Advance shall be included in the calculation of the Commitment Fee due with respect to the Final Advance.

(j)    <u>Loan Servicing Fee</u>.  At the time of funding of the Emergency Advance, the Interim Advance, and the Final Advance, from the

proceeds of each such funding, the Debtor shall pay to the Lender a loan servicing fee calculated as one and two-tenths percent (1.2%) of the maximum amount of each such Advance (the "<u>Loan Servicing Fee</u>"), due and fully earned at Closing.  In the event of a Loan Extension, the Debtor shall pay to the Lender an additional sum equal to one and two-tenths percent (1.2%) of the principal balance of the Loan outstanding as of the original Maturity Date.

(k)    <u>Unused Line Fee</u>.  Lender shall be entitled to a monthly unused line fee (the "<u>Line Fee</u>") calculated on the basis of thirty-five (35) basis points per month (.35%) of the principal amount of the Loan which has not been advanced.

(l)    <u>Exit Fee</u>.  Upon payoff of the Loan, the Debtor shall pay the Lender a one percent (1.00%) exit fee on the principal amount of the Loan advanced.

(m)    <u>Closing Costs and Expenses</u>.    At the initial funding of the Emergency Advance, the Interim Advance, and the Final Advance, and with each subsequent disbursement of the Loan, the Debtor shall pay (i) all of the Lender's reasonable costs and expenses related to the Loan or to the Debtor's chapter 11 case (including the Lender's reasonable travel and lodging expenses) and out-of-pocket expenses and the fees and expenses of the Lender's counsel, all accrued as of such Closing (which shall automatically become part of the Loan), (ii) all recording costs (including mortgage, intangible tax, or other transaction taxes) for filing the recordable DIP Loan Documents, and (iii) the costs, if any, of the Lender's Mortgagee Title Insurance Policy (the "<u>Title Policy</u>") which the Lender's counsel shall provide at the minimum promulgated rate, or such other rate to which the Lender may agree, all of such costs under (i)-(iii) being collectively referred to as the "<u>Closing Costs</u>."  In addition, the Debtor shall pay to the Lender the reasonable fees and expenses (including reasonable travel expenses, if any) of the Lender's counsel, arising subsequent to Closing in connection with this transaction and the representation of the Lender in the Debtor's bankruptcy case, which such reasonable fees and expenses shall be deemed a part of the Loan secured by the Collateral.  The reasonable legal fees of the Lender's counsel shall be calculated on a time-spent basis, based upon the standard hourly rates of the Lender's counsel generally charged to clients of that firm for similar matters and shall be paid from proceeds of the Loan.  The Loan shall be without cost to the Lender.  The Debtor assumes liability for and

will pay all costs and expenses required to satisfy the conditions of the Commitment Letter and the making of the Loan as provided thereunder (including the costs of the Title Policy).

(n)    <u>Prepayment</u>.  The Debtor may prepay the Loan at any time.  In the event of a prepayment, the Commitment Fee, the Closing Costs, or other costs paid pursuant to the terms of the Commitment Letter and in the DIP Loan Documents shall not, under any circumstances, be refunded.  Should prepayment occur within the first one hundred eighty (180) days after the date of Closing of the Emergency Advance, the Lender shall retain and earn, in full, one hundred eighty (180) days of the prepaid interest, computed at the Contract Rate on the Maximum Loan Amount.

(o)    <u>Covenants</u>.  In addition to all standard covenants required by the Lender in debtor-in-possession loans made under like circumstances, including all standard commercially appropriate terms in the Lender's absolute discretion, the Lender will require that the Debtor provide the covenants set forth in the section of the Commitment Letter titled "COVENANTS."

(p)    <u>Default; Remedies</u>.  The DIP Loan Documents shall contain standard events of default and remedies customarily required by the Lender.

(q)    <u>Conditions</u>.  The Lender's obligations to close the Loan or to make the Emergency Advance, the Interim Advance, and the Final Advance shall be expressly subject to the satisfaction of the certain conditions precedent set forth in the section of the Commitment Letter titled "CONDITIONS."

(r)    <u>Assignment of Loan</u>.  The Lender may assign any or all of its obligations and rights under the Commitment Letter to one or more assignees or participants, and may collaterally assign the DIP Loan Documents to the Lender's lender under any existing or future loan arrangement.

(s)    <u>Application Fee; Legal Fee Deposit</u>.  An Application Fee in the amount of $50,000.00 and Legal Fee Deposit in the amount of $15,000.00 has been paid by Eliot Lappen (the "<u>Remitter</u>"), to the Lender and its counsel, respectively.  The Remitter is a close personal friend of Jack Antaramian, who has been involved in prior business transactions with Jack Antaramian, but has no relationship to any of the Debtors, other than the fact that he funded the Debtors' pre-petition retainers paid to Jennis & Bowen,

P.L. Lappen has not been promised repayment or any interest in the Debtor in exchange for paying the Application Fee and the Legal Deposit Fee. In the event that after the filing of this Motion, the Debtor proceeds to obtain alternative financing from a competing lender, the competing lender shall reimburse the Remitter for the Application Fee and the Legal Fee Deposit.

(t)     <u>Stand-by Fee.</u> A stand-by commitment loan fee shall be earned by the Lender in the amount of four percent (4%) of the Maximum Loan Amount if after the entry of a Final Order approving the Loan, (i) the Debtor elects not to enter the Loan, (ii) the Bankruptcy Court authorizes the Debtor to obtain financing from another party, or (iii) the Debtor fails to satisfy a material condition contained in the Commitment.

17.     The description of the Commitment Letter contained in this Motion is intended as a summary only and is qualified in its entirety by reference to the Commitment Letter itself, and to the extent there is any inconsistency between the language of the Commitment Letter and the description thereof set forth in this Motion, the Commitment Letter shall control any such inconsistency. Each creditor of the Debtor and party in interest should read, consider, and carefully analyze the terms and provisions of the Commitment Letter.

<u>**REQUEST FOR RELIEF**</u>

18.     The Debtor hereby requests authority, pursuant to Sections 364(c)(1), 364(c)(2), and 364(d)(1) of the Bankruptcy Code, and Bankruptcy Rules 4001, 6004(h) and 9014, to obtain postpetition loans, advances, and other financial accommodations from the Lender in an amount of up to $6,250,000.00, secured by a security interest in and lien on all assets and property interests of the Debtor and its estate, which will be senior to any existing prepetition and postpetition liens and interests including, without limitation, any and all liens held by the Secured Creditors. The Lender shall not be

granted a lien on any claim or cause of action arising under Sections 544, 545, 548, 549, or 553(b) of the Bankruptcy Code.

19.    The liens to be granted in favor of the Lender shall prime the liens granted in favor of the Secured Creditors and any other entity as to the Debtor's assets, including any claims or liens of the Project Creditors or any other party, except for *ad valorem* taxes for 2014 and subsequent years.  Except with respect to the DIP Liens, all parties shall retain all rights, defenses, and claims and the Debtor shall reserve, and is not waiving, any of its rights with respect to the claims and liens of any entity other than the Lender.

20.    As additional assurance at the DIP Facility will be repaid, the Lender will be granted and allowed a superpriority administrative expense claim in accordance with Section 364(c)(1) of the Bankruptcy Code having priority and right of payment over any and all other obligations, liabilities, and indebtedness of the Debtor and its estate, now in existence or hereafter incurred by the Debtor, and over any and all administrative expenses or priority claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), and 726 of the Bankruptcy Code, except for the Carve-Out.

21.    Prior to negotiating the Commitment Letter with the Lender, the Debtor attempted to locate postpetition financing through commercial and non-commercial sources which typically provide similar financing (including existing lenders), but

discovered that access to funding through those sources is virtually impossible, particularly in light of the extensive litigation which has plagued the Resort

22.     Accordingly, the Debtor is not presently able to obtain, in the ordinary course of business or otherwise:

(a)     pursuant to Section 364(a) or 364(b) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense;

(b)     pursuant to Section 364(c)(1) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code;

(c)     pursuant to Section 364(c)(2) of the Bankruptcy Code, credit secured by a lien on property of the estate that is not otherwise subject to a lien;

(d)     pursuant to Section 364(c)(3) of the Bankruptcy Code, credit secured by a junior lien on property of the estate that is subject to a lien; or

(e)     credit on any basis other than that described in the Commitment Letter.

23.     After considering all of the alternatives, the Debtor has concluded, in the exercise of the Debtor's business judgment, that the financing to be provided under the terms of the Commitment Letter and this Motion represents the best financing available to the Debtor and is in the best interests of the Debtor's estate, its creditors, and other parties in interest.  The DIP Facility will allow the Debtor to continue the operation of the Resort without interruption and maximize its value for all stakeholders as a going concern.

24.     The Debtor has not obtained the consent of the Secured Creditors to the relief sought by this Motion, including the grant of a senior lien in favor of the Lender as contemplated by the Commitment Letter.  Further, as to all other parties in interest, the Debtor alleges that all such parties will be adequately protected within the meaning of Sections 361 and 363 of the Bankruptcy Code, by virtue of numerous factors, including:

(a)     the Debtor's assets will continue to serve as collateral for the liens of such parties to the extent such parties have a secured claim in the Collateral;

(b)     a significant portion of the amounts advanced by the Lender will be used to fund the costs of maintaining the Resort, which will significantly increase the value of the Collateral; and

(c)     the amounts advanced under the DIP Facility will be in accordance with a budget approved by the Lender and subject to approval of this Court.

25.     Good cause has been shown for the entry of an order granting this Motion pursuant to Bankruptcy Rule 4001(c)(2) and making such order effective immediately upon its entry pursuant to Bankruptcy Rule 6004(h).  In particular, entry of the order authorizing the Emergency Advance is in the best interest of the Debtor and its estate, its business, and its ability to continue to operate as a going concern and to avoid immediate and irreparable harm.

26.     The Debtor's satisfactory performance over the past year and the need for continued, uninterrupted management as the Resort goes into the "season" dictate that it is in the best interest of the creditors that the Debtor remain in possession of its property and continue to operate the Resort.

27.     As set forth in the Motion and based upon the record of this proceeding, the Lender and the Debtor, have negotiated the terms and conditions of the DIP Facility in good faith and at arm's-length, and the terms and conditions of the Commitment Letter are fair and reasonable and are supported by reasonably equivalent value.  The Debtor requests that this Court find any credit extended by the Lender pursuant to the terms of the Commitment Letter and the DIP Loan Documents will have been extended in "good faith" (as that term is used in Section 364(e) of the Bankruptcy Code).

**BASIS AND NEED FOR**
**EMERGENCY PRELIMINARY HEARING AND IMMEDIATE RELIEF**

28.     If the Debtors are denied the ability to obtain the DIP Facility, there will be direct, immediate, and irreparable harm to the Debtors' ability to continue business operations, perform its obligations, service its guests and tenants, and to maximize its assets and distributions to its creditors.  The primary recoveries of creditors in these cases will derive from the Debtors' ability to maximize the value of the Resort and related business operations, and the Debtor believes that use of the DIP Facility will maximize the value of the Resort.  For those reasons, the Debtors request a Preliminary Hearing on an emergency basis.

29.     A copy of this Motion is being sent to the Secured Creditors and their Counsel and to all creditors in this chapter 11 case.  Accordingly, the Debtors request that the Court enter an order finding that such notice of this Motion is adequate and sufficient and complies with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court.

**WHEREFORE**, the Debtors respectfully request that the Court (1) enter an order granting this Motion in a form substantially similar to the proposed form of order attached as **Exhibit "C,"** (2) authorizing the Debtor to obtain financing and grant liens pursuant to Sections 364(c) and (d) in accordance with the terms of this Motion, the Commitment Letter, and the DIP Loan Documents, and (3) grant such other and further relief as the Court deems fair and just under the circumstances.

Dated this 16th day of September 2014.

/s/ Kathleen L. DiSanto
Chad S. Bowen
Florida Bar No. 0138290
Kathleen L. DiSanto
Florida Bar No. 58512
**Jennis & Bowen, P.L.**
400 N. Ashley Dr., Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
cbowen@jennisbowen.com
kdisanto@jennisbowen.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing has been furnished by CM/ECF electronic service and/or via email to: **Office of the U.S. Trustee**, 501 E. Polk Street, Suite 1200, Tampa, FL  33602; **Theodore L. Tripp, Jr., and Michael R. Dal Lago**, Hahn Loeser & Parks, LLP, 2400 First Street, Suite 300, Fort Myers, FL  33901; **Robert D.W. Landon, III**, Kenny Nachwalter, PA, 1100 Miami Center, 201 South Biscayne Boulevard, Miami, FL  33131; **Edwin Rice**, Glenn Rasmussen, P.A., 100 South Ashley Drive, Suite 1300, Tampa, FL 33602; **Joseph L. Rebak and Bryan T. West**, Akerman LLP, One Southeast Third Avenue, Suite 2500, Miami, FL 33131-1714; Richard H. Malchon, Jr., Adams and Reese, LLP, 150 Second Avenue North, Suite 1700, St. Petersburg, FL 33701; **Louis X. Amato**, Louis X. Amato P.A., 28209 Jewel Fish Lane, Bonita Springs, FL 34135-8639 (Louisa@louamato.com); and to those parties who receive electronic notices via CM/ECF in the ordinary course of business, on this the 16th day of September, 2014.

I HEREBY CERTIFY that true and correct copies of the foregoing will be furnished by U.S. Mail, postage prepaid, to: **Louis X. Amato**, Louis X. Amato P.A., 28209 Jewel Fish Lane, Bonita Springs, FL 34135-8639; **EFO Financial Group, LLC, c/o Robert P. Grammen**, 2770 Indian River Boulevard, Suite 500, Vero Beach, FL 32960; those parties listed on the **All Creditor Matrix** (attached to the original of this Motion only) who do not receive electronic notices via CM/ECF in the ordinary course of business, on the 17th day of September, 2014.

*/s/  Kathleen L. DiSanto*
Kathleen L. DiSanto

{00243294.DOC;1}

Label Matrix for local noticing
113A-9
Case 9:14-bk-10145-FMD
Middle District of Florida
Ft. Myers
Tue Sep 16 22:32:58 EDT 2014

Antaramian Family Trust
PO Box 2307
Naples, FL 34106-2307

Antaramian Family, LLC.
PO Box 2307
Naples, FL 34106-2307

Antaramian Properties, LLC.
Antaramian Family, LLC
Antaramian Family Trust
(Jointly Administered)
PO Box 2307
Naples, FL 34106-2307

BMC-Benchmark Management Company
c/o Richard H. Malchon
Adams and Reese LLP
150 2nd Ave N, Suite 1700
St. Petersburg, FL 33701-3343

Caryl E. Delano
Tampa
, FL

Hahn Loeser & Parks LLP
5811 Pelican Bay Blvd., Suite 650
Naples, FL 34108-2794

Knightsbridge Partner of Naples, LLC
c/o Akerman LLP
One Southeast Third Avenue
25th Floor
Miami, FL 33131-1700

NBR Shoppes, LLC
c/o Jordi Guso
Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131-5319

Naples Bay Financial Holdings, LLC
c/o Edwin G. Rice
Glenn Rasmussen, P.A.
100 S. Ashley Drive
Suite 1300
Tampa, FL 33602-5364

Antaramian Family Trust
1500 Fifth Avenue South
Naples, FL 34102-3492

Antaramian Family, LLC
1500 Fifth Avenue South
Naples, FL 34102-3492

Bajo, Cuva Cohen & Trust
100 North Tampa Street
Suite 1900
Tampa, FL 33602-5853

Bear's Plumbing So. FL, Inc.
1900 Trade Center Way
Naples, FL 34109-6267

Benchmark Hospitality Int'l
4 Waterway Square, Ste. 300
Woodlands, TX 77380-3854

Blackhill Partners, LLC
2651 N. Harwood Street
Suite 120
Dallas, TX 75201-1545

Brannock & Humphries
100 South Ashley Drive
Suite 1130
Tampa, FL 33602-5320

Bryan T. West
One Southeast Third Avenue, Suite 2500
Miami, Florida 33131-1700

Building 1,2,3 Fund
c/o Antaramian Properties
1500 Fifth Avenue South
Naples, FL 34102-3492

Burns & Levinson, LLC
125 Summer Street
Boston, MA 02110-1624

Daniel A. DeMarco, Esq.
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, OH 44114-2303

Department of Labor and Security
Hartman Building Suite 307
2012 Capital Circle Southeast
Tallahassee FL 32399 0648

Department of Revenue
PO Box 6668
Tallahassee FL 32314-6668

Florida Power & Light
General Mail Facility
Miami, FL 33188-0001

Hahn Loeser & Parks LLP
c/o Michael R. Dal Lago, Esq.
5811 Pelican Bay Blvd., Suite 650
Naples, FL 34108-2794

Hahn Loeser & Parks, LLP
2400 First Street
Suite 300
Fort Myers, FL 33901-2982

Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street NW
Washington, DC 20004-1171

Hotel Services Fund
c/o Antaramian Properties
1500 Fifth Avenue South
Naples, FL 34102-3492

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Jack Antaramian
1500 Fifth Avenue South
Naples, FL 34102-3492

James Nelson & Bryan Nelson
1458 Butterfield Court
Marco Island, FL 34145-3800

Jordi Guso, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

Joseph L. Rebak
One Southeast Third Avenue, Suite 2500
Miami, Florida 33131-1700

Knightsbridge Partners of
Naples, LLC
Akerman LLP
One Southeast Third Avenue, Suite 2500
Miami, Florida 33131-1700

Knightsbridge Partners of Naples, LLC
c/o Joseph Rebak and Bryan West
Akerman LLP
One Southeast Third Avenue
25th Floor
Miami, Florida 33131-1715

Marenas Resort
18683 Collins Avenue
North Miami Beach, FL 33160-2404

Michael R. Dal Lago, Esq.
Hahn Loeser & Parks LLP
5811 Pelican Bay Blvd., Suite 650
Naples, FL 34108-2794

NBR Shoppes, LLC
c/o Jordi Guso, Esq.
Berger Singerman, LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-5319

NBR Shoppes, LLC
c/o Jordi Guso, Esquire
1450 Brickell Avenue, Suite 1900
Miami, FL 33131-3453

Naples Bay Financial
Holdings, LLC
600 5th Avenue South
Suite 207
Naples, FL 34102-6642

Naples Bay Financial Holdings, LLC
c/o Edwin G. Rice
100 S. Ashley Drive
Suite 1300
Tampa, FL 33602-5309

One Bal Harbour & Spa
10295 Collins Avenue
Miami Beach, FL 33154-1475

Pezeshkan, Zand and Sehayek
c/o Robert D. W. Landon, III
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4332

Richard H. Malchon, Jr., Esquire
Adams and Reese LLP
Attorney for Benchmark
150 Second Avenue No., Suite 1700
St. Petersburg, FL 33701-3343

Robert D W Landon, III
Kenny Nachwalter PA
201 South Biscayne Boulevard
1100 Miami Center
Miami, FL 33136-2806

Rocke, McClean & Sbar
2309 S. MacDill Avenue
Tampa, FL 33629-5918

Salvy Florida, LLC
888 Washington Street
Suite 106
Dedham, MA 02026-6027

Senga Developement, LP
2101 Penrose Avenue
Philadelphia, PA 19145-5614

T-Y Group
10800 NW 103rd Street
Suite 1
Miami, FL 33178-1049

The Marina at Naples Bay
Resort Association, Inc.
1500 Fifth Avenue South
Naples, FL 34102-3492

Theodore L. Tripp, Jr., Esq.
Kevin P. Fularczyk, Esq.
Hahn Loeser & Parks LLP
2400 First St., Ste 300
Fort Myers, FL 33901-2982

Jordi Guso +
Berger Singerman P.A.
1450 Brickell Avenue, 19th Floor
Miami, FL 33131-3444

David S Jennis +
Jennis & Bowen PL
400 North Ashley Drive
Suite 2540
Tampa, FL 33602-4317

Richard H Malchon Jr. +
Adams and Reese, LLP
150 Second Ave. No., Suite 1700
St. Petersburg, FL 33701-3343

Edwin G Rice +
Glenn Rasmussen, PA
PO Box 3333
100 South Ashley Drive, Suite 1300
Tampa, FL 33602-5364

United States Trustee - FTM +
Timberlake Annex, Suite 1200
501 E. Polk Street
Tampa, FL 33602-3949

Chad S Bowen +
Jennis & Bowen PL
400 North Ashley Drive
Suite 2540
Tampa, FL 33602-4317

Kathleen L DiSanto +
Jennis & Bowen
400 North Ashley Drive
Suite 2540
Tampa, FL 33602-4317

Bryan T West +
Akerman, LLP
One SE 3rd Avenue
25th Floor
Miami, FL 33131-1700

Michael R Dal Lago +
Hahn Loeser & Parks LLP
5811 Pelican Bay Blvd.
Suite 650
Naples, FL 34108-2794

Joseph L Rebak +
Akerman, LLP
One SE 3rd Avenue
Miami, FL 33131-1715

Erik Johanson +
Jennis & Bowen, PL
400 N Ashley Dr
Tampa, FL 33602-4300

Eric D Jacobs +
Jennis and Bowen, P.L.
400 North Ashley Drive
Suite 2540
Tampa, FL 33602-4317


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(u)Fred Pezeshkan

(u)Raymond Sehayek

(u)Iraj Zand


(d)Naples Bay Financial Holdings, LLC
c/o Edwin G. Rice
Glenn Rasmussen, P.A.
100 S. Ashley Drive, Suite 1300
Tampa, FL 33602-5364

(d)Robert D W Landon III +
Kenny Nachwalter PA
201 South Biscayne Boulevard
1100 Miami Center
Miami, FL 33136-2806

(u)Note: Entries with a '+' at the end of the
name have an email address on file in CMECF
-------------------------------------------
Note: Entries with a '-' at the end of the
name have filed a claim in this case

End of Label Matrix
Mailable recipients   62
Bypassed recipients    6
Total                 68